HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROBERT J. DIEDERICH,

        Plaintiff,

   v.

PROVIDENCE HEALTH &
SERVICES, et al.

        Defendants.

CASE NO. C10-1558 RAJ

ORDER GRANTING
DEFENDANTS' SECOND
MOTION FOR SUMMARY
JUDGMENT

## I.  INTRODUCTION

This matter comes before the court on the "Second Motion for Partial Summary Judgment" by defendants Providence Health & Services ("Providence") (doing business as St. Peter Hospital), Kevin Haughton, Maggie Miller, Lisa Johnson, Jennifer Playstead, and Lowell Dightman.[1]  Dkt. # 51.  Defendants move for summary judgment on the remaining claims against them:  Disability discrimination under the American Disabilities Act ("ADA") and the WLAD, hostile work environment under the ADA and the WLAD,

---

[1] Providence and the individual defendants filed a first partial summary judgment motion seeking dismissal of plaintiff's claims under the Washington Law Against Discrimination ("WLAD") on the basis that St. Peter Hospital is a non-profit religious organization that is exempt from the WLAD.  Dkt. # 31.  Given the court's dismissal of the WLAD claims here, the first summary judgment motion has been rendered MOOT.

1  retaliation under the ADA and the WLAD, age discrimination under the Age

2  Discrimination in Employment Act ("ADEA") and the WLAD, and breach of contract

3  under state law.[2]  Plaintiff has only responded to defendants' arguments regarding breach

4  of contract, disparate treatment disability discrimination under the WLAD, retaliation

5  under the WLAD and the ADA, and disability-based hostile work environment under the

6  ADA and the WLAD.  The court construes plaintiff's failure to address his other claims

7  as an admission that the motion has merit.  Local Rules W.D. Wash. CR 7(b)(2).  Since

8  plaintiff does not dispute that his other claims should be dismissed, the court GRANTS

9  defendants' motion with respect to plaintiff's claims for age discrimination under the

10  ADEA and the WLAD, disparate treatment disability discrimination under the ADA, and

11  failure to accommodate under the ADA and the WLAD.

12        Having considered the memoranda, exhibits, oral argument, and the record herein,

13  the court GRANTS defendants' motion for summary judgment.

14                              **II. BACKGROUND**

15        In 2004, Dr. Diederich graduated from the University of Washington School of

16  Medicine.  Dkt. # 64 (Diederich Decl.) ¶ 4.  Dr. Diederich started his residency in family

17  medicine at Swedish Hospital under director Dr. Sam Cullison.  *Id.* ¶ 5.  Dr. Cullison

18  terminated Dr. Diederich, claiming he had bad performance.  *Id.*  Dr. Diederich sued

19  Swedish and Cullison claiming they discriminated against him based on disability due to

20  a temporary, severe depressive episode.  *Id.*  In 2006, Dr. Diederich obtained a resolution

21  of the lawsuit, and Dr. Cullison wrote him a recommendation that he used to apply to

22  Providence's residency program.  *Id.*  Dr. Diederich began his residency at Providence in

23  July 2007.  *Id.* ¶ 6.  Beginning on January 11, 2008 and continuing through his

24  termination, Dr. Diederich received a number of memoranda citing patient care and

25

26            _____

27        [2] The only claims remaining against the individual defendants are the disparate treatment, hostile work environment and retaliation claims under the WLAD.

1   professionalism issues.  Dkt. # 64-1 (Exs. 10-15, 21, 23 to Diederich Decl.).  Dr.

2   Diederich appealed his termination pursuant to the grievance procedure, and the appeals

3   panel upheld the termination.  Dkt. # 53-1 (Ex. 30 to Haughton Decl.).

4        Dr. Diederich filed this lawsuit alleging, among other things, that Providence

5   discriminated against him on the basis of age and disability and retaliated against him for

6   engaging in protected activity.  Dr. Diederich believes the patient care and

7   professionalism issues cited in the memoranda and termination letter were pretextual.

8                              **III. ANALYSIS**

9        Summary judgment is appropriate if there is no genuine dispute as to any material

10  fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

11  56(a).  The moving party bears the initial burden of demonstrating the absence of a

12  genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

13  Where the moving party will have the burden of proof at trial, it must affirmatively

14  demonstrate that no reasonable trier of fact could find other than for the moving party.

15  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  On an issue where the

16  nonmoving party will bear the burden of proof at trial, the moving party can prevail

17  merely by pointing out to the district court that there is an absence of evidence to support

18  the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 325.  If the moving party meets

19  the initial burden, the opposing party must set forth specific facts showing that there is a

20  genuine issue of fact for trial in order to defeat the motion.  *Anderson v. Liberty Lobby,*

21  *Inc.*, 477 U.S. 242, 250 (1986).  The court must view the evidence in the light most

22  favorable to the nonmoving party and draw all reasonable inferences in that party's favor.

23  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-51 (2000).

24

25

26

27

**A.     Motions to Supplement the Record**

On August 24, 2012, the parties filed motions to supplement the record pursuant to the court's July 27, 2012 minute order (Dkt. # 85).  Dkt. # 87,[3] # 89.

Plaintiff asks the court to consider comparator evidence to show that he was singled out for disparate treatment, and argues that the disparate treatment shows that defendants acted based on improper retaliatory motives.  Dkt. # 89 at 2:22-3:3.  The court has reviewed all of the supplemental evidence provided by plaintiff.

The concept of "similarly situated" employees may be relevant to both the prima facie and pretext prongs of the *McDonnel Douglas* framework in a disparate treatment claim.  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1158 (9th Cir. 2010).  A showing that a defendant treated similarly situated employees <u>outside of plaintiff's protected class</u> more favorably would be probative of pretext.  *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (emphasis added).[4]  Here, plaintiff conceded during oral argument that he has not provided the court with any evidence that Residents A through J are outside of Dr. Diederich's protected class, i.e. no disability or no complaints of discrimination.  Accordingly, plaintiff has failed to demonstrate that the treatment received by Residents A through J would be probative of pretext because there is no

---

[3] Defendants are incorrect that the court granted each party the opportunity to supplement the record.  The court granted the parties the opportunity to file a motion to supplement the record.  Dkt. # 85 at 1:24-25 ("The parties may file a motion to supplement the record . . . .").  Accordingly, the court construes the "supplemental brief" (Dkt. # 87) as a motion to supplement.

[4] During oral argument, plaintiff relied heavily on the "mosaic" approach of the Seventh Circuit for the proposition that evidence that similarly situated employees were treated differently is relevant to demonstrate causation in retaliation claims.  *See Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012).  The Ninth Circuit has not adopted the mosaic approach, and the court declines to do so here.  Nevertheless, the court assumes without deciding that the Ninth Circuit would consider comparator evidence relevant to the causation element in the prima facie case and to pretext.  This court believes that the Ninth Circuit would apply *Vasquez* with respect to the pretext prong of retaliation.  Accordingly, the court believes that to the extent that comparator evidence would be probative of pretext in retaliation claims, plaintiff may demonstrate pretext by providing evidence that defendant treated similarly situated employees <u>outside of plaintiff's protected class</u> more favorably.

1  evidence that they are outside of plaintiff's protected class.  Accordingly, the court

2  DENIES plaintiff's motion to supplement the record.  Dkt. # 89.

3      Defendants move to supplement the record with respect to two issues:  (1) that

4  Providence lacked knowledge that Dr. Diederich previously sued Dr. Cullison and

5  Swedish, and (2) that defendants were not motivated by discriminatory animus with

6  respect to Dr. Diederich's retaliation and disparate treatment claims.  Dkt. # 87.  Because

7  the court finds *infra* that plaintiff failed to demonstrate a prima facie case of retaliation or

8  to raise a genuine issue of material fact with respect pretext, the court need not address

9  the supplemental evidence offered by defendants.  Accordingly, the court DENIES

10  defendants' motion to supplement.  Dkt. # 87.

11  **B.  Evidentiary Analysis**

12      In resolving a motion for summary judgment, the court may only consider

13  admissible evidence.  *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002).  At the

14  summary judgment stage, a court focuses on the admissibility of the evidence's content,

15  not on the admissibility of the evidence's form.  *Fraser v. Goodale*, 342 F.3d 1032, 1036

16  (9th Cir. 2003).

17      Defendants move to strike exhibits 3, 7, 8, 16, 19, 24, 25, 29, 31, 33, and 34 that

18  are attached to plaintiff's declaration for lack of authentication.  Dkt. # 67 at 2.

19  Defendants also move to strike various statements in plaintiff's declaration as improper

20  hearsay.  *Id.* at 2-3.

21      In his declaration, Dr. Diederich states:  "All exhibits hereto are true and correct

22  copies of the documents they purport to be and were either created by me, or sent or

23  received by me at on or about the time indicated or were produced in this litigation."

24  Dkt. # 64 (Diederich Decl.) ¶ 2.  Although this is not a proper authentication of each

25  exhibit, the court believes each of these documents could be properly authenticated at

26

27

1   trial.[5]  Accordingly, the court focuses on the admissibility of the evidence's content, and
2   overrules defendants' objections to strike these exhibits.

3        The court has read Dr. Diederich's 46-page declaration in its entirety.  Rather than
4   limit his declaration to statements of fact of which he has personal knowledge, the vast
5   majority of Dr. Diederich's declaration consists of argument, analysis and interpretation
6   of other evidence, improper opinion testimony, speculation, hearsay, and legal
7   conclusions.  Fed. R. Evid. 602, 701, 702, 801.  The court does not appreciate plaintiff's
8   attempt to turn his 30-page response (which the court hesitatingly approved) into a 70+
9   page argument.  Nor does the court appreciate counsel's strained interpretations and
10  representations to the court that are predicated on plaintiff's speculation and improper
11  opinion testimony.

12       In accordance with the Federal Rules of Evidence, the court has considered
13  statements of fact that appear to be within Dr. Diederich's personal knowledge that are
14  not otherwise inadmissible.  The court has also considered the exhibits attached to Dr.
15  Diederich's declaration.  The court has disregarded all other arguments, legal
16  conclusions, hearsay, speculation, and improper opinion testimony.  The court notes that
17  statements of party opponents are not hearsay.[6]  Fed. R. Evid. 801(d)(2).

18  **C.    Disparate Treatment Disability Discrimination (WLAD)**

19       In employment discrimination cases where plaintiff has not attempted to
20  demonstrate direct evidence of discriminatory intent, the *McDonnell Douglas* burden-
21  shifting analysis augments the familiar summary judgment standard.  *Aragon v. Republic*
22  *Silver State Disposal, Inc.*, 292 F.3d 654, 658 (9th Cir. 2002) (citing *McDonnell Douglas*
23  *Corp. v. Green*, 411 U.S. 792 (1973)).  Although the *McDonnell Douglas* analysis

24  _____

25       [5] During oral argument, defendants stipulated to the authenticity of these documents for
26  purposes of this motion.
         [6] *See* footnotes 7 and 8 *infra* for examples of inadmissible testimony the court has
27  disregarded.

1  evolved to address employment discrimination claims invoking federal law, Washington

2  courts apply substantially the same standard to claims invoking the WLAD. *Kastanis v.*

3  *Educ. Emps. Credit Union*, 122 Wn. 2d 483, 490, 859 P.2d 26 (1993).  Under the

4  *McDonnell Douglas* framework, plaintiff must offer evidence supporting a prima facie

5  case of unlawful discrimination.  *Id.*  If he succeeds, the burden shifts to defendants to

6  produce evidence of a lawful motive for terminating plaintiff.  *Id.* at 491.  If defendants

7  succeed, plaintiff is obligated to produce evidence that defendants' stated lawful motive

8  is pretext.  *Id.*  If there is sufficient evidence of pretext, the case must go to the jury.  *Id.*

9  The WLAD prohibits employers from discharging or discriminating against any person in

10  the terms or conditions of employment because of, *inter alia*, "the presence of any

11  sensory, mental, or physical disability . . . ."  RCW 49.60.180(2) & (3).

12      A prima facie case of disparate treatment disability discrimination has four

13  elements:  (1) the employee is disabled, (2) the employee is doing satisfactory work, (3)

14  the employee suffered an adverse employment action, and (4) the employee was

15  discharged under circumstances that raise a reasonable inference of unlawful

16  discrimination.  *Callahan v. Walla Walla Housing Authority*, 126 Wn. App. 812, 819-20,

17  110 P.3d 782 (2005).  Under the WLAD, disability is defined as "the presence of a

18  sensory, mental, or physical impairment that: (i) Is medically cognizable or diagnosable;

19  or (ii) Exists as a record or history; or (iii) Is perceived to exist whether or not it exists in

20  fact."  RCW 49.60.040(7)(a).  "A disability exists whether it is temporary or permanent,

21  common or uncommon, mitigated or unmitigated, or whether or not it limits the ability to

22  work generally or work at a particular job or whether or not it limits any other activity

23  within the scope of this chapter."  RCW 49.60.040(7)(b).  "Impairment" includes, but is

24  not limited to:

25      (i)  Any physiological disorder, or condition, cosmetic disfigurement, or
        anatomical loss affecting one or more of the following body systems:

26      Neurological, musculoskeletal, special sense organs, respiratory, including

27

speech organs, cardiovascular, reproductive, digestive, genitor-urinary, hemic and lymphatic, skin, and endocrine; or

(ii)   Any mental, developmental, traumatic, or psychological disorder, including but not limited to cognitive limitation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

RCW 49.60.040(7)(c).

Defendants concede that for purposes of summary judgment, plaintiff's herniated disc and regarded-as depression, the two alleged disabilities identified by plaintiff in his deposition, would qualify as a disability under the WLAD. Dkt. # 51 at 11 n.8. *See* Dkt. # 52-1 at 29-30 (Ex. A to Gaviria Decl., Diederich Depo. at 236:20-237:9). However, plaintiff, in his opposition, has now identified a third alleged disability: "an acute gastrointestinal illness" that occurred on March 21, 2008 that extended to the following day. Dkt. # 52-1 at 95 (Ex. I to Gaviria Decl.); Dkt. # 64 (Diederich Decl.) ¶ 80, 85 ("ill with nausea due to a virus and on the point of throwing up"). Plaintiff states that he was "ill with nausea due to a virus[,]" "on the point of throwing up[,]" and "highly contagious." Dkt. # 64 (Diederich Decl.) ¶ 80. Dr. Diederich also states that he was so sick he had to lie down and then leave the hospital to go home. *Id.* at ¶¶ 80-81. Based on this evidence and the circumstances presented here, the court finds that no reasonable juror could find that a twenty-four to forty-eight hour gastrointestinal illness qualifies as an impairment under the WLAD, or otherwise qualifies as a "disability." Defendants assume that plaintiff has made out a prima facie case with respect to the remaining elements. Dkt. # 51 at 15.

Defendants argue that they have presented sufficient evidence that, if believed by a trier of fact, would support a finding that the employment action was not a result of unlawful discrimination. Dkt. # 51 at 14. The court agrees. Plaintiff has a well-documented history of practice and professionalism issues. *See* Dkt. # 53 (Haughton Decl.) ¶¶ 4-10, 16-22, Exs. 6-9, 11-15, 18-20, 22-26. Accordingly, defendants have met their burden, and the burden shifts to plaintiff to demonstrate pretext.

1    A plaintiff "can show pretext in two ways: either 'directly by persuading the court

2  that a discriminatory reason more likely motivated the employer, or indirectly by

3  showing that the employer's proffered explanation is unworthy of credence.'" *Stegall v.*

4  *Citadel Broadcasting Co.*, 350 F.3d 1061, 1068 (9th Cir. 2003) (quoting *Texas Dep't of*

5  *Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  Where there is direct evidence of an

6  employer's discriminatory intent, the Ninth Circuit has held that plaintiff need only show

7  little or minimal evidence of discrimination to show pretext.  *Kang v. U. Lim. Am., Inc.*,

8  296 F.3d 810, 819 (9th Cir. 2002).  Where evidence of pretext is circumstantial, rather

9  than direct, the Ninth Circuit has held that plaintiff must produce "specific" and

10  "substantial" facts to create a triable issue of pretext.  *Earl v. Nielsen Media Research,*

11  *Inc.*, 658 F.3d 1108, 1113 (9th Cir. 2011).  In *Cornwell v. Electra Central Credit Union*,

12  the Ninth Circuit addressed the differing amount of evidence required for direct versus

13  circumstantial evidence of discrimination.  439 F.3d 1018 (9th Cir. 2006) (Fisher, J.,

14  Gould, J. Bea, J.).  The Ninth Circuit explained its reasoning in a prior case in which it

15  stated that the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100

16  (2003) required that "circumstantial and direct evidence should be treated alike."  *Id.* at

17  1030.  The *Cornwell* court relied on "the Supreme Court's recognition in *Costa* that

18  circumstantial evidence may be 'more certain, satisfying and persuasive than direct

19  evidence[.]'"  *Id.*  The *Cornwell* court concluded that in the context of summary

20  judgment, Title VII does not require a disparate treatment plaintiff relying on

21  circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on

22  direct evidence.  *Id.*  The court recognized:  "Although there may be some tension in our

23  post-*Costa* cases on this point-several of our cases decided after *Costa* repeat the *Godwin*

24  requirement that a plaintiff's circumstantial evidence of pretext must be 'specific' and

25  'substantial' – this panel may not overturn Ninth Circuit precedents in the absence of

26  'intervening higher authority' that is 'clearly irreconcilable' with a prior circuit holding."

27

*Id.* at 1030-31.  This court need not decide this issue, because the court finds that plaintiff has not provided even minimal evidence demonstrating pretext.

With respect to the herniated disc, Dr. Diederich seems to indicate that denial of a time off request with respect to a "painful cervical radiculopathy" is evidence of pretext. Dkt. # 61 at 10-11.  However, the uncontroverted evidence demonstrates that it was his request for vacation that was denied.[7]  In the email protesting the rejection of his vacation request, plaintiff stated:

> I submitted a vacation request July 9th for time off in August during my surgical rotation.
>
> * * *
>
> My first priority in life is to my children, who are on summer vacation.  I live for the moments that I can be with them, which isn't very frequent.  I spent a week with them in June (R1 vacation time) visiting grandparents, but did so in considerable pain from this cervical radiculopathy I've endured the past 6 weeks.  I'd like to be able to enjoy another week vacation with them before they return back to school.

Dkt. # 64-1 at 94 (Ex. 18 to Diederich Decl.).   Although this email mentions his neck pain, it is clear that the request for time off was for vacation, not medical leave.  *Id.*  The court finds that no reasonable juror could find that this request for vacation was a request for medical leave or accommodations for his neck pain.  Indeed, when plaintiff requested medical leave for surgery and recovery, defendants approved the request.  Dkt. # 53 (Haughton Decl.) ¶ 28, Ex. 33.

---

[7] In his declaration, plaintiff attempts to characterize the request for vacation by stating: "I cited both ongoing pain from neck issues and desire to be with my children."  This characterization of the email is the type of inadmissible evidence the court has disregarded.  The court has the email documenting the request in which he mentions his neck pain in the context of his last vacation with his children.  Dkt. # 64-1 at 94 (Ex. 18 to Diederich Decl.).  Plaintiff also states:  "At this time I had severe pain and told my supervisors this."  However, plaintiff does not attribute his request for vacation to his neck pain.  Rather, he attributes his request for vacation to his desire "to be able to enjoy another week of vacation with [his children] before they return back to school."  *Id.*

1      Plaintiff also argues that the appeals board decision is evidence of pretext.  Dkt. #

2  61 at 16, 29.  The termination letter provides:

3      Effective[] Friday, September 12, 2008, you are discharged from the
       Providence St. Peter Hospital Family Medicine Residency Program.  This
4      action is due to your ongoing behavior which interferes with your ability to
       provide safe patient care.  Specifically:
5

6      1. Failure to follow up on a pediatric admission after being asked to do so at
       checkout. . . .
7      2. You did not notify the attending of an obstetrical laceration repair on a
       patient that had come in and delivered precipitously. . . .
8      3. During this same case, you were asked by the nurse to gown and glove
       for the laceration repair.  You declined to do so, continuing to touch the
9      repair field with clean but not sterile gloves.
10

11  Dkt. # 53-1 at 67 (Ex. 26 to Haughton Decl.) (emphasis added); #64-2 at 10 (Ex. 23 to

12  Diederich Decl.) (emphasis added).  The final appeals report provides a summary of Dr.

13  Diederich's performance and professional concerns leading to and including the

14  September 10, 2008 faculty meeting.  Dkt. # 53-1 at 77-79 (Ex. 30 to Haughton Decl.).

15  Although the conclusions of fact did not address the three specific instances cited in the

16  termination letter specifically, it did state that there were "numerous incidents of sub-

17  standard medical practice, lack of personal accountability and integrity, and

18  unprofessionalism."  *Id.* at 81.  Dr. Diederich argues that the specific reasons cited in the

19  termination letter were "withdrawn" in the appeal.  Dkt. # 61 at 16.  There is no evidence

20  that the three reasons listed were withdrawn in the appeal.  To the contrary, the three

21  specific reasons are included in the case summary.  Dkt. # 53-1 at 79 (Ex. 30 to Haughton

22  Decl.).  The fact that the appeals panel provided additional justifications to uphold the

23  termination is not by itself evidence of pretext.  The additional justifications provided are

24  not fundamentally different or incompatible with the termination letter, especially where

25  the termination letter refers to Dr. Diederich's "ongoing behavior" that interfered with his

26  ability to provide safe patient care.  *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912,

27  918 (9th Cir. 1996) (no genuine issue of material fact as to whether reasons for layoff

ORDER GRANTING DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT- 11

1   were pretextual where reasons provided by employer for layoff were not incompatible,

2   and therefore not properly described as "shifting reasons.").

3          With respect to the regarded-as depression, plaintiff points to "repeated comments

4   about depression" or "current perception of depression." Dkt. # 61 at 29. Plaintiff admits

5   that he disclosed his prior depression in his application materials to the residency

6   program. Dkt. # 52-1 at 21 (Ex. A to Gaviria Decl., Diederich Depo. at 164:10-16).

7   Plaintiff also admits that the residency program would have knowledge of his prior

8   depression independent of anything related to his lawsuit against Swedish. *Id.* Indeed,

9   Dr. Cullison's recommendation letter states: "Bob went on medical leave due to

10  depression. Prior to going on leave, he exhibited problems (such as trouble organizing

11  his thoughts, difficulty presenting patients and perceived resistance to feedback). We

12  understand that his physician has attributed these problems to his depression and that

13  both Bob and his physician believe that he will be successful in resuming his residency."

14  Dkt. # 52-1 at 38 (Ex. B to Gaviria Decl.). Plaintiff claims he was asked whether or not

15  he was depressed "half a dozen times" from February 2008 through September 2008.

16  Dkt. # 52-1 at 21 (Ex. A to Gaviria Decl., Diederich Depo. at 164:5-9.); Dkt. # 64

17  (Diederich Decl.) ¶ 111. Plaintiff claims that he was asked about his depression during

18  meetings in which Dr. Miller "sharply criticized [his] performance." Dkt. # 64

19  (Diederich Decl.) ¶ 111. Plaintiff admits that he "was not depressed in 2007-2008 and

20  showed no signs of being depressed[.]" *Id.* ¶ 112; Dkt. # 52-1 at 22 (Ex. A to Gaviria

21  Decl., Diederich Depo. at 165:6-13). Dr. Miller has testified that during plaintiff's

22  interview, plaintiff told her that he had not completed his first year at Swedish because he

23  was struggling with depression, and that the depression was behind him. Dkt. # 63-1 at

24  19 (Ex. 36 to Stockmeyer Decl., Miller Depo. at 33:7-34:1).[8]

25

26        [8] In his declaration, plaintiff purports to attribute Dr. Miller's questions about depression
    to his lawsuit against Swedish because that "was the only context she knew about [him] in which
27  [he] had been depressed." Dkt. # 64 (Diederich Decl.) ¶ 112. The court notes that these types of

1    Given these facts, the court finds that plaintiff has failed to show pretext either

2 directly by persuading the court that a discriminatory reason more likely motivated the

3 employer, or indirectly by showing that the employer's proffered explanation is unworthy

4 of credence. *Stegall*, 350 F.3d at 1068.

5    This finding is bolstered when the court applies the same-actor inference to

6 plaintiff's regarded-as depression.[9]  "[W]here the same actor is responsible for both the

7 hiring and the firing of a discrimination plaintiff, and both actions occur within a short

8 period of time, a strong inference arises that there was no discriminatory motive."

9 *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270-71 (9th Cir. 1996); *Hill v. BCTI*

10 *Income Fund-I*, 144 Wn. 2d 172, 23 P.3d 440 (2001), *overruled on other grounds by*,

11 *McClarty v. Totem Elec.*, 157 Wn. 2d 214, 137 P.3d 844 (2006).  Plaintiff applied to the

12 residency program in late 2006, and began his residency on July 1, 2007.  Dkt. # 64

13 (Diederich Decl.) ¶ 6; Dkt. # 53 (Haughton Decl.) ¶ 3.  As Program Director, Dr.

14 Haughton was involved in his hiring in March 2007.  Dkt. # 53 (Haughton Decl.) ¶ 3.  Dr.

15 Haughton terminated plaintiff's employment on September 12, 2008.  *Id.* ¶ 22, Ex. 26.  It

16 is undisputed that Dr. Haughton knew of plaintiff's depression when he was hired.  Dkt. #

17 52-1 at 21 (Ex. A to Gaviria Decl., Diederich Depo. at 164:10-16) & at 38 (Ex. B); #53

18 (Haughton Decl.) ¶ 3, Ex. 1.  Under these circumstances, a strong inference arises that

19 there was no discriminatory motive.[10]

20

21

22

23 argumentative, speculative statements that are not based on personal knowledge and are
improper opinion testimony are the type of statements that the court has disregarded.

24    [9] During oral argument, plaintiff conceded that the same actor inference applies, but
argued that plaintiff has overcome the strong inference that there was no discriminatory motive.

25    [10] During oral argument, plaintiff argued that in December 2007, Drs. Haughton,

26 Johnson, and Miller knew of the prior lawsuit, and that knowledge of the prior lawsuit triggered
a new animus.  However, the court has found *infra* that there is no evidence that any of these

27 doctors had knowledge of the prior lawsuit before his termination in September 2008.
Accordingly, plaintiff has failed to overcome the strong inference of non-discrimination.

1    Accordingly, plaintiff has failed to demonstrate a genuine issue of material fact

2  with respect to pretext.

3  **D.   Retaliation (ADA & WLAD)**

4    The ADA and the WLAD prohibit an employer from taking an adverse

5  employment action against an employee based on protected conduct.  *Brown v. City of*

6  *Tucson*, 336 F.3d 1181, 1186-87 (9th Cir. 2003) (citing 42 U.S.C. § 12203); *Hines v.*

7  *Todd Pac. Shipyards Corp.*, 127 Wn. App. 356, 374, 112 P.3d 522 (2005) (citing RCW

8  49.60.210).   To establish a prima facie case of retaliation, plaintiff must demonstrate that

9  (1) she engaged in statutorily protected activity, (2) defendants took some adverse

10  employment action against her, and (3) there is a causal connection between the protected

11  activity and the discharge.  *Barnett v. U.S. Air, Inc.* 228 F.3d 1105, 1121 (9th Cir. 2000)

12  (en banc) (adopting Title VII retaliation framework for ADA retaliation claims), *vacated*

13  *on other grounds by* 535 U.S. 391 (2002); *Corville v. Cobarc Servs., Inc.*, 73 Wn. App.

14  433, 439, 869 P.2d 1103, 1105 (1994).  If plaintiff establishes a prima facie case, the

15  evidentiary burden shifts to the employer to produce admissible evidence of a legitimate,

16  non-retaliatory reason for the discharge.  *Brooks v. City of San Mateo*, 229 F.3d 917, 928

17  (9th Cir. 2000); *Hollenback v. Shriners Hospitals for Children*, 149 Wn. App. 810, 823,

18  206 P.3d 337 (2009).  If the employer meets its burden, the presumption is removed and

19  the employee must then establish a genuine issue of material fact as to pretext.  *Id.*

20    The "protected activity" must fall squarely within the protections of the ADA and

21  the WLAD.  *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any

22  individual because such individual has opposed any act or practice *made unlawful by this*

23  *chapter* or because such individual made a charge, testified, assisted, or participated in

24  any manner in an investigation, proceeding, or hearing *under this chapter.*") (emphasis

25  added); RCW 49.60.210(1) ("It is an unfair practice for any employer . . . to discharge,

26  expel, or otherwise discriminate against any person because he or she has opposed any

27  practices *forbidden by this chapter*, or because he or she has filed a charge, testified, or

assisted in any *proceeding under this chapter*.") (emphasis added); *see Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002) (opposition protected when based on reasonable belief that employer engaged in unlawful employment practice); *Estevez v. Faculty Club of Univ. of Wash.*, 129 Wn. App. 774, 798, 120 P.3d 579 (2005) (employee must show that she opposed conduct that was arguably a WLAD violation).

In his briefing and during oral argument, plaintiff identified three instances of protected activity to support his claims for retaliation:  (1) request for time off and complaints for denial of time off request, (2) complaints about needing time off while sick; and (3) the prior suit for disability discrimination against Swedish.  Dkt. # 61 at 24.

With respect to the first, plaintiff argues that he was denied time off for his neck condition.  Dkt. # 61.  However, the court has already found that no reasonable juror could find that this request for vacation was a request for medical leave or accommodations for his neck pain.  For the reasons already explained above, the court further finds that no reasonable jury could find that his request for vacation could be construed as "protected activity" within the meaning of the ADA and the WLAD.  The same is true for plaintiff's complaints about defendant's denial of his vacation request.

With respect to the second basis, plaintiff argues that "he opposed orders to work while sick and heaving" and that he made "various complaints to Miller and Haughton about needing time off when sick."  Dkt. # 61 at 24.  *See* Dkt. # 64 (Diederich Decl.) ¶¶ 80-82, 92.  The court has already found that no reasonable jury could find that a twenty-four to forty-eight hour gastrointestinal illness could qualify as a disability under the circumstances presented to the court.  The court further finds that no reasonable jury could find that defendants' response to plaintiff's oppositional activity in March 2008 could even arguably be unlawful or a violation of the WLAD.  Even if the court found

1    that these complaints were protected activity, plaintiff has failed to demonstrate a causal

2    link between these complaints and his discharge.[11]

3          With respect to the third basis, plaintiff has not presented any admissible evidence

4    that defendants were actually aware of his prior suit against Swedish.  *See Cohen v. Fred*

5    *Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) ("Essential to a causal link is evidence that

6    the employer was aware that the plaintiff had engaged in protected activity.").  Rather,

7    plaintiff proffers speculation, argument, and improper opinion testimony to attempt to

8    establish a causal connection between his prior, unrelated lawsuit against Swedish and his

9    termination, including the following:  (1) Haughton's December 2007 comment "I

10   learned all about you" and "I spoke with Sam Cullison" (Dkt. # 61 [Opp'n] at 7 (citing

11   Dkt. # 64 [Diederich Decl.] ¶¶ 59-62)); (2) prior to July 2007, Haughton, Miller, Johnson

12   and Dightman had known Cullison professionally (*id.* (citing Haughton Depo. at 25:5-8,

13   Johnson Depo. at 9:19-10:7, Miller Depo. at 30:23-25, Dightman Depo. at 46:1-11)); (3)

14   "Haughton and Cullison ran in the same 'pack.'" (*id.* (citing Haughton Depo. at 20:15-

15   24)); (4) Haughton saw Cullison for years at quarterly directors meetings from the UW

16   network (*id.* at 8 (citing Haughton Depo. at 20:5-11)); and (5) Haughton saw Cullison at

17   the December 2007 UWSOM Network meeting (*id.* (citing Haugton Depo. at 49:9-18[12])).

18         Haughton testified that Sam Cullison was a director at the quarterly director

19   meetings, that they both attended the Society of Teachers of Family Medicine meetings,

20   and that he never saw Dr. Cullison outside of a professional contact.  Dkt. # 52-1 at 42

21   (Ex. C to Gaviria Decl., Haughton Depo. at 20:9-24, 21:5-9).  Haughton also testified that

22   he did not talk to Dr. Cullison about Dr. Diederich, and that he had no knowledge that Dr.

23   Diederich had sued Cullison or his prior program before Dr. Diederich was terminated.

24   _____

25   [11] The court assumes, without deciding, that plaintiff's prior complaint of discrimination

26   against Swedish may form the basis of his retaliation complaint against defendants.

     [12] The court notes that neither party has provided the court with this page of Haughton's

27   deposition testimony.

*Id.* at 20:12-14; 24:10-25:11.  Dr. Johnson testified that she did not learn that Dr. Diederich had sued Dr. Cullison and Swedish until after this lawsuit started.  Dkt. # 52-1 at 55 (Ex. D to Gaviria Decl., Johnson Depo. at 19:4-12).  Dr. Dightman testified that he had never discussed Dr. Diederich with Dr. Cullison, and that he did not remember ever learning that Dr. Diederich sued his prior residency program.  Dkt. # 52-1 at 78 (Ex. G to Gaviria Decl., Dightman Depo. at 46:14-21).  Dr. Miller testified that during 2007 and 2008, she was not aware that Dr. Diederich had sued another family medicine residency program, and that she only learned about it after he had been terminated.  Dkt. # 52-1 at 83 (Ex. H to Gaviria Decl., Miller Depo. at 30:3-11).  These facts are not in dispute.  Accordingly, plaintiff cannot demonstrate a causal link between his prior lawsuit against Swedish and his termination.

Plaintiff has failed to demonstrate a prima facie case of retaliation.

**E.**     **Hostile Work Environment (ADA & WLAD)**

For purposes of this motion, the court assumes, without deciding, that federal and state law recognize a cause of action for disability discrimination based on a hostile work environment.[13]  *See Robel v. Roundup Corp.*, 148 Wn. 2d 35, 45 (2002) ("Just as the federal cases extended the Title VII hostile work environment claim (and its standards of proof) to the ADA, we may extend the reasoning in *Glasgow* to disability claims[.]").  To establish a prima facie case of hostile work environment, Dr. Diederich must show that (1) he was disabled, (2) the harassment was unwelcome, (3) it was because of his disability, (4) it affected the terms and conditions of his employment, and (5) it is imputable to defendants.[14]  *Id.*  The third element requires that the disability of the

---

[13] The Ninth Circuit has not determined whether a plaintiff may maintain a hostile work environment claim under the ADA.  *Brown*, 336 F.3d at 1190 (declining to decide the issue).

[14] Unlike a disparate treatment claim, which requires an adverse employment action, a hostile work environment claim focuses on the cumulative effect of a series of actions, where the individual actions are not adverse employment actions.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002); *Porter v. Cal. Dep't of Corr.*, 383 F.3d 1018, 1027-28 (9th Cir. 2004), *amended by* 419 F.3d 885 (9th Cir. 2005).

plaintiff be a motivating factor for the unlawful discrimination. *Id.* at 46. The fourth element requires that the harassment was severe or pervasive enough to create an objectively hostile or abusive work environment. *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 21 (1993); *Robel*, 148 Wn. 2d at 46.

The court has already found that no reasonable jury could find that plaintiff's gastrointestinal illness could qualify as a disability under the circumstances presented here. The court has also found that no reasonable juror could find that this request for vacation was a request for medical leave or accommodations for his neck pain. Accordingly, conduct related to his gastrointestinal illness or complaints regarding the denial of a vacation request necessarily cannot form the basis of a hostile work environment claim based on disability. The remaining conduct plaintiff complains of includes "constant comments about depression," "comments about 'learned all about you'," and "the 2008 reference to 'failure' at his prior program when in fact he left Swedish due to depression[.]" Dkt. # 61 at 31. Plaintiff admits that he was asked "half a dozen times" whether he was depressed over a seven month period. Dkt. # 52-1 at 21 (Ex. A to Gaviria Decl., Diederich Depo. at 164:5-9.); Dkt. # 64 (Diederich Decl.) ¶ 111. Additionally, there is no admissible evidence linking the "learned all about you" comment to the Swedish lawsuit. Plaintiff's speculation and improper lay opinion is not evidence. Even if the court considered the half a dozen comments about depression, the "learned all about you" comment, and the reference to "failure" at his prior program, the court would conclude that no reasonable juror could find such conduct was so severe and pervasive as to create an objectively hostile work environment.

Accordingly, plaintiff has failed to establish a prima facie case for hostile work environment.

**F.      Breach of Contract**

The only question addressed to the court with respect to the plaintiff's breach of contract claim is whether, as a matter of law, "Dr. Diederich can ask for damages beyond his R2 contract." Dkt. # 67 (Reply) at 13.

A party to a contract has a contractual right only to that which it bargained for – its reasonable expectation. *Ford v. Trendwest Resorts, Inc.*, 146 Wn. 2d 146, 156 (2002). Contract law is concerned with the goal of placing the plaintiff where he or she would be if the defendant had performed as promised. *Alejandre v. Bull*, 159 Wn. 2d 674, 682 (2007). Where economic losses occur, recovery is confined to contract to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract. *Id.* at 682-83. Damages recoverable for breach of contract are those that may fairly and reasonably be considered either arising naturally from a breach of contract, or may reasonably have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of the contract. *Gaglidari v. Denny's Rests, Inc.*, 117 Wn. 2d 426, 446 (1991) (citing *Hadley v. Baxendale*, 9 Ex. 341, 354, 156 Eng.Rep. 145, 151 (1854)).

The Washington Supreme Court has drawn a distinction between the ability to recover future earnings for at-will versus for-cause employment. *Ford*, 146 Wn. 2d at 156-57. The *Ford* court held that "lost earnings cannot measure damages for the breach of an employment at-will contract because the parties to such a contract do not bargain for future earnings. By its very nature, at-will employment precludes an expectation of future earnings." *Id.* at 157. The court reasoned that since "Ford did not bargain for future earnings, he cannot claim they measure the harm he sustained by [the] breach. To hold that Ford reasonably expected future earnings under his employment at-will contract would create a new exception to the at-will employment doctrine not supported in law." *Id.*

1    Dr. Diederich characterizes his residency contract for medical education and
2  completion certificate as "for cause" based on the non-renewal policy.  Dkt. # 61 at 22.
3  However, Dr. Diederich's contract for residency does not seem to fall squarely within at-
4  will employment or for-cause employment cases.  *See e.g., Roberts v. Atlantic Richfield*
5  *Co.*, 88 Wn. 2d 887, 894 (1977); *Bakotich v. Swanson*, 91 Wn. App. 311, 314-318
6  (1998).  Dr. Diederich concedes that in addition to the salary listed in the contract, he
7  expected to receive education, experience, and a certification of completion at the end of
8  the three years.  Dkt. # 64 (Diederich Decl.) ¶ 19; #64-1 at 36 (Ex. 5 to Diederich Decl.)
9  ("To consider the compensation stated above and the experience and instruction received
10  as sole compensation . . . .").

11    During oral argument, defendants argued that a contract for medical residency is a
12  hybrid relationship containing both academic and employment features.  Courts that have
13  analyzed whether a medical resident contract should be interpreted as an academic or
14  employment contract generally rely on the context of the circumstances and issue
15  presented.  For instance, in the tax context, a resident agreement is considered an
16  employment contract.  *Mayo Found. For Med. Educ. & Research v. United States*, 131 S.
17  Ct. 704, 715 (2011).  However, when courts address dismissal or disciplinary matters
18  with respect to due process rights of residents or breach of contract, courts conclude that
19  the dismissal or disciplinary decisions are academic decisions.  *See Davis v. Mann*, 882
20  F.2d 967, 974 (5th Cir. 1989) ("It is well-known that the primary purpose of a residency
21  program is not employment or a stipend, but the academic training and the academic
22  certification for successful completion of the program. . . . The same factors that justified
23  minimal procedural protections in the *Horowitz* medical school context apply with equal
24  force to the paid residency situation."); *Gul v.Ctr. for Family Med.*, 2009 S.D. 12, P23,
25  762 N.W.2d 629 (S.D. 2009) ("We agree that medical residents are students and not
26  employees. . . . As a student, Dr. Gul is not entitled to the same due process protection as
27  an employee."); *Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111, 117-18 (Conn. 1996)

1    ("hospital's decision to dismiss the plaintiff for poor clinical performance constituted an

2    academic, rather than an employment decision"); *Ross v. Univ. of Minn.*, 439 N.W.2d 28,

3    33 (Minn. Ct. App. 1989) ("a resident is a student for the purpose of reviewing the

4    decision to dismiss for academic reasons").

5            Regardless, to determine whether Dr. Diederich may seek damages beyond his

6    second year contract, the court must determine whether loss of future earnings was

7    reasonably within the contemplation of the parties at the time the contract was made as a

8    probable result of a breach of the contract.

9            The contract itself for Dr. Diederich's second year residency only contemplated

10   appointment of a one-year term, beginning July 1, 2008 and ending June 30, 2009.  Dkt.

11   # 64-1 at 33 (Ex. 5 to Diederich Decl.).  The agreed upon salary "per contract period

12   during all such times that the resident is actively engaged in the program" was

13   $46,904.00.  *Id.*  The contract lists a policy of non-reappointment regarding non-renewal

14   of residents' appointments, which requires advance notice and the availability of

15   grievance procedures.  *Id.* at 34.  One of the general duties and expectations of residents

16   to be considered for reappointment is the ability to perform job expectations as specified

17   in the Resident Job Description.  *Id.* at 38.  "Reappointment and promotion, upon faculty

18   recommendation, will be based on regularly received feedback about all aspects of

19   resident's performance."  *Id.*  The ACGME guidelines, which plaintiff contends has been

20   incorporated into the contract, provide for conditions for reappointment:

21           Non-renewal of appointment or non-promotion:  In instances where a
             resident's agreement will not be renewed, or when a resident will not be
22           promoted to the next level of training, the Sponsoring Institution must
             ensure that its programs provide the resident(s) with a written notice of
23           intent no later than four months prior to the end of the resident's current
             agreement.  If the primary reason(s) for the non-renewal or non-promotion
24           occurs within the four months prior to the end of the agreement, the
             Sponsoring Institution must ensure that its programs provide the resident(s)
25           with as much written notice of the intent not to renew or not to promote as
             circumstances will reasonably allow, prior to the end of the agreement.
26

27

ORDER GRANTING DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT- 21

Residents must be allowed to implement the institution's grievance procedures if they receive a written notice either of intent not to renew their agreement(s) or of intent to renew their agreement(s) but not to promote them to next level of training.

Dkt. # 64-1 at 54 (Ex. 7 [ACGME Standards] to Diederich Decl.).

Dr. Diederich claims that during his interview with Dr. Haughton prior to joining the program, Dr. Haughton described the residency program as a graduate medical education program "that had a great track record of turning out residents who went on to become successful family medicine doctors in the area served by UW School of Medicine." Dkt. # 64 (Diederich Decl.) ¶ 15. Dr. Haughton also "noted that the education at Providence led to its 'graduates' passing boards at a high rate and he said that Providence would provide a great education." *Id.* Dr. Diederich claims that, while he was at Providence, Dr. Haughton often told him the goal of the program was to both produce family medicine practitioners and keep them in the area served by Providence. *Id.* ¶ 17. During his deposition, Dr. Haughton testified that success for the program is "cranking out successful family physicians." Dkt. # 63-1 at 12 (Ex. 35 to Stockmeyer Decl. [Haughton Depo. at 216:19-21]). Dr. Haughton also testified that he assumed that a resident's "intended career development is they would graduate from the program; and so if they were dismissed, that would not be consistent with their plan, with their intended career course." *Id.* at 3 (73:3-10). Dr. Haughton also agreed that the expectation of the program is to take people who will finish the program and have good careers as doctors, and that if a resident is dismissed, the dismissal would "make it impossible" for the resident to fulfill the program and have a good career as a doctor. *Id.* (73:11-20). Dr. Diederich also refers the court to the affiliation agreement between University of Washington and Providence that indicates that they would work collaboratively toward "assuring that the pipeline of students and residents entering family medicine result in adequate numbers of family physicians practicing. Dkt. # 64-1 at 12-13 (Ex. 3 to Diederich Decl. [Affiliation Agreement ¶ 1.7]). Providence's policies and the ACGME

1  standards also provide detailed due process and grievance procedures for residents.  Dkt.

2  # 63-1 at 26-63 (Exs. 4-7 to Diederich Decl.).

3      Even if the court takes all of the above facts into consideration, Dr. Diederich

4  cannot escape the fact that he had an express contract that limited his term to one year,

5  subject to reappointment.[15]  Under these circumstances, the court concludes that loss of

6  future earnings was not reasonably within the contemplation of the parties at the time the

7  contract was made as a probable result of a breach of the contract.  Accordingly, Dr.

8  Diederich's damages are limited to his contract.

9                              **IV. CONCLUSION**

10     For all the foregoing reasons, the court GRANTS defendant's motion for summary

11 judgment. Dkt. # 51.  The Clerk is directed to terminate the first partial summary

12 judgment motion and motion to supplement the opposition with respect to the first

13 summary judgment motion as MOOT.  Dkt. # 31, # 45.  The Clerk is also directed to

14 terminate the parties' motions to supplement the record with respect to the second partial

15 summary judgment motion as DENIED.  Dkt. # 87, # 89.  The Clerk is also directed to

16 enter an amended scheduling order with a new trial date of December 3, 2012 on the

17 remaining claim of breach of contract against Providence.

18

19

20

21 ─────────────────

22     [15] The Washington authority cited by Dr. Diederich is readily distinguishable and
inapposite because Dr. Diederich is not, and does not have, a business.  *See Larsen v. Walton*

23 *Plywood Co.*, 65 Wash. 2d 1 (1964) (lost profits of new business sought in stockholders'
derivative action for breach of contract); *Alpine Indus., Inc. v. Gohl*, 30 Wn. App. 750 (1981)

24 (lost profits of business sought in breach of construction contract case for construction delay).
Nor is the court persuaded by the out-of-state authority where students had a four-year contract

25 for a degree.  *See Sharick v. Se. Univ. of the Health Sciences, Inc.*, 780 So. 2d 136 (Fla. App.
2006) (medical student); *Morehouse College Inc. v. McGaha*, 627 S.E. 2d 39 (Ga. 2006)

26 (undergraduate student).  Here, Dr. Diederich had a one-year term contract, subject to
reappointment.

27

ORDER GRANTING DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT- 23

Dated this 26th day of September, 2012.

The Honorable Richard A. Jones
United States District Judge